**UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS**

No. 20-4155

ALLEN GUMPENBERGER, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued January 19, 2022                                          Decided March 3, 2022)

*Kenneth H. Dojaquez*, of Topeka, Kansas, for the appellant.

*James L. Heiberg*, with whom *Richard A. Sauber*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Dustin P. Elias*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before ALLEN, FALVEY, and JAQUITH, *Judges*.

ALLEN, *Judge*: Arturo Valadez served the Nation honorably in the United States Marine Corps. He is in receipt of VA benefits for numerous conditions related to his military service. The backdrop of this appeal concerns Mr. Valadez's efforts to obtain certain benefits related to a traumatic brain injury (TBI) and a total disability rating based on individual unemployability (TDIU).

We say that Mr. Valadez's claims provide the "backdrop" for this appeal because these matters are not directly before us. Instead, this appeal, which is timely and over which the Court has jurisdiction,[1] concerns appellant Allen Gumpenberger, a non-attorney practitioner accredited to represent claimants before VA, and his assertion that he is entitled to a fee to be taken from certain benefits VA awarded to Mr. Valadez. Specifically, Mr. Gumpenberger appeals a July 17, 2019, decision of the Board of Veterans' Appeals that denied entitlement to agent fees based on past-due benefits VA awarded to the veteran for his TBI. Mr. Gumpenberger is only entitled to a portion of the veteran's past-due benefits if a Notice of Disagreement (NOD) he filed on the

---

[1] *See* 38 U.S.C. §§ 7252(a), 7266(a).

veteran's behalf in June 2013 concerning a May 2013 rating decision encompassed a TBI rating claim.[2] Appellant has failed to show that the Board erred when it determined he was not entitled to a fee under 38 U.S.C. § 5904, the statute setting out the requirements for receiving such a fee.

As we explain below, the NOD appellant filed on the veteran's behalf in June 2013 expressly and unambiguously appealed the Board's decision on two issues: Entitlement to TDIU and denial of service connection for an acquired psychiatric disorder (an appeal the veteran later withdrew). The NOD did not include an appeal of the disability rating assigned for TBI. Thus, under the applicable VA regulation, 38 C.F.R. § 20.201, the NOD was effective only as to TDIU and service connection for the psychiatric condition. And because appellant's entitlement to fees is tied to the submission of this June 2013 NOD under section 5904, he is not entitled to fees awarded on other matters, something he seeks in this action.

The reality is that appellant made a tactical choice in how he proceeded in representing the veteran, choosing to pursue an administrative appeal concerning entitlement to TDIU (and, originally, service connection for an acquired psychiatric disorder) and not a higher schedular rating for TBI. That tactical choice dictates the outcome of this appeal because there is no NOD concerning the assignment of a TBI disability rating, the font of funds from which appellant seeks to take a fee out of benefits awarded to the veteran. And a 100% TBI schedular rating and TDIU are distinct benefits such that an appeal of TDIU does not encompass a dispute about a schedular rating for TBI. Therefore, we will affirm the Board's July 2019 decision.

## I. FACTS AND PROCEDURAL HISTORY

Appellant represented Mr. Valadez[3] before VA at the time of a May 2013 rating decision that granted the veteran a 70% disability rating for TBI and various other ratings for TBI residuals but denied (1) service connection for an acquired psychiatric disorder secondary to TBI and (2) entitlement to TDIU.[4]

---

[2] This matter requires us to consider past versions of 38 U.S.C. §§ 5904 and 7105 as well as 38 C.F.R. § 20.201, under the legacy appeals system, which has been significantly altered with the passage of the Veterans Appeals Improvement and Modernization Act of 2017 (AMA). Pub. L. No. 115-55, 131 Stat. 1105 (Aug. 23, 2017). At the time relevant to this appeal, an attorney or agent was entitled to fees for work performed after an NOD was filed. *See* 38 U.S.C. § 5904 (2013). The more recent amendments to section 5904, along with the newer versions of section 7105 and § 20.201, are not before us today.

[3] On October 21, 2021, the Court ordered the Secretary to serve notice of these proceedings on Mr. Valadez to allow him an opportunity to intervene. However, Mr. Valadez did not respond to the Court's order.

[4] Record (R.) at 746-58. VA awarded the veteran a 30% rating for migraine headaches, a 20% rating for seizure

2

In June 2013, the veteran, through appellant, filed an NOD specifically identifying entitlement to TDIU and the denial of service connection for an acquired psychiatric condition as the matters with which the veteran disagreed.[5] An August 2014 Statement of the Case (SOC) listed service connection for an acquired psychiatric disorder and entitlement to TDIU as the only issues on appeal, consistent with the NOD.[6] The veteran perfected an appeal as to those two issues in October 2014, noting he wanted to appeal "all of the issues listed" on the SOC and specifically mentioning the acquired psychiatric disorder claim and TDIU.[7] In a December 2015 letter, appellant notified VA that the veteran continued to seek entitlement to TDIU but that he was withdrawing his appeal as to the acquired psychiatric disorder claim.[8]

In July 2016, VA sent the veteran and appellant a letter that explained VA was reviewing TBI cases in which a VA examination had been conducted and that the veteran qualified for such a review.[9] The veteran responded to VA's letter, indicating he wanted his case reprocessed under VA's special TBI review.[10] As a result of that review, VA granted the veteran a 100% schedular rating for TBI in a September 2016 rating decision.[11]

Thereafter, appellant sought fees from VA based on the veteran's award of a 100% disability rating for TBI. In a March 2017 letter, VA denied him entitlement to agent fees,[12] noting that VA "reprocessed [the veteran's] TBI claim in accordance with Secretary of Veterans Affairs authority to award equitable relief" such that "the resultant favorable decision is not due to an appeal, so direct payment of fees is denied."[13] Appellant filed an NOD, challenging VA's denial of fees.[14] He explained that VA misinterpreted his December 2015 withdrawal letter and that he

---

disorder, a 10% rating for tinnitus, and a noncompensable rating for impotence, all as secondary to his service-connected TBI. R. at 748. The veteran was also awarded special monthly compensation based on loss of use of a creative organ. *Id.*

[5] R. at 732.

[6] R. at 682, 717-21.

[7] R. at 435.

[8] R. at 429.

[9] R. at 427-28.

[10] R. at 426.

[11] R. at 326-66.

[12] R. at 182-85.

[13] R. at 184-85.

[14] R. at 132-33.

withdrew the veteran's psychiatric disorder claim because "the symptoms overlapped TBI," but that the veteran still sought a 100% rating for TBI at that time.[15] He stated that "[t]he mere fact that your office elected to award[] a schedular 100% for TBI residuals rather than awarding individual unemployability doesn't negate the fact that the issue of an increased evaluation to total was on appeal."[16]

Appellant perfected an appeal of the denial of agent fees, arguing in an August 2018 Substantive Appeal that the withdrawal of the veteran's acquired psychiatric claim was "conditional upon the grant of [TDIU]."[17] Therefore, he asserted, the veteran's acquired psychiatric claim, as a residual of TBI, was still on appeal. Additionally, appellant argued that "the avenue to establish a 100% [rating] . . . is immaterial," whether through TDIU or a 100% schedular rating.[18] Thus, he concluded that the NOD he filed for the veteran in June 2013 "created the avenue to entitlement" to a 100% rating.[19] In a January 2019 letter, appellant contended that the TBI rating remained on appeal, intertwined with the issue of TDIU.[20]

In the July 2019 decision on appeal, the Board concluded that agent fees were not warranted because no NOD had been filed as to the issue of the proper disability evaluation for TBI after service connection was granted in May 2013.[21] Instead, the Board found "the NOD filed by appellant in June 2013 was to the issues of service connection for an acquired psychiatric disorder and to entitlement to TDIU."[22] The Board noted that the award of a 100% disability rating for TBI

---

[15] R. at 172. Appellant's contention that VA misinterpreted his December 2015 withdrawal letter has merit. In its March 2017 letter, VA stated: "We received a letter from your representative on January 16, 2016, specifically withdrawing the issue of [TBI] from your appeal." R. at 184. In truth, appellant's letter expressly withdrew the issue of veteran's psychiatric claim from the appeal, not TBI, which appellant did not include in his NOD. In an April 2017 letter, appellant promptly highlighted VA's mistake. R. at 172. In its July 2018 SOC, VA persisted in characterizing the TBI appeal as withdrawn, stating "direct payment of fees was denied because TBI was reprocessed in accordance with Secretary of Veterans Affairs authority to award equitable relief under 38 U.S.C. § 503(a) *after it was withdrawn from the appeal*." R. at 65 (emphasis added). However, the RO's characterization of the TBI claim was subsumed by the Board decision we are reviewing. *See* 38 C.F.R. § 20.1104 (2021); *see also* 38 U.S.C. § 7252(a). "[A]n appellant may not assert error in an RO decision that has been subsumed by a Board decision." *Sutton v. Nicholson*, 20 Vet.App. 419, 422 (2006). In this case, the Board did not make the same mistake or endorse the RO's misinterpretation.

[16] *Id.*

[17] R. at 47.

[18] *Id.*

[19] *Id.*

[20] R. at 12.

[21] R. at 6.

[22] *Id.*

was "based on VA's own internal review" and that a September 2016 notification letter that accompanied the grant of the 100% TBI rating explained that the veteran's "combined evaluation . . . was 100[%]" and "TDIU was not granted."[23] Thus, the Board concluded that because no NOD was filed as to the schedular rating for TBI, agent fees based on that award were not warranted. This appeal ensued.

## II. PARTIES' ARGUMENTS

Appellant asks the Court to reverse the Board's finding that no NOD was filed with respect to the veteran's TBI rating. He argues that the language of the relevant statutes does not require any specificity in an NOD, even when multiple issues were decided in an initial determination. Therefore, he asserts that it does not matter that the June 2013 NOD did not refer to a disagreement with the TBI rating. He contends that neither 38 U.S.C. § 5904(c)(1), which allows for representatives to be paid for services after an NOD is "filed with respect to the case," nor 38 U.S.C. § 7105(a), which at the relevant time required an NOD be in writing and filed within 1 year of the underlying determination,[24] requires that a claimant identify the issue(s) he or she wishes to appeal. Thus, he maintains that the Board erred in requiring that the June 2013 NOD link to a specific issue in the May 2013 rating decision or ask for a precise benefit.[25] He contends that the pro-veteran canon of interpretation, when applied to section 7105(a), supports his reading of the statute. Under this interpretation of the statutes, appellant asserts that once the June 2013 NOD was filed, he became entitled to agent fees for any ensuing award of benefits, including, as relevant here, the 100% disability rating VA awarded for TBI.

Appellant also contends that to the extent 38 C.F.R. § 20.201, VA's regulation concerning NODs, requires greater specificity in the June 2013 NOD, the Court should hold the regulation is invalid because it is inconsistent with section 7105(a). He argues that "[a]ny reading of § 20.201 that narrows an [NOD] to only the specific entitlements identified by the claimant is not supported by the plain language of the statute."[26] If no specificity is required in an NOD, then, appellant contends, once the June 2013 NOD was filed, VA was on notice that the veteran disagreed with

---

[23] R. at 5-6.

[24] 38 U.S.C. § 7105(a) (2013).

[25] Appellant's Brief (Br.) at 10.

[26] *Id.* at 14.

some aspect of the rating decision and all issues contained therein were subject to an administrative appeal and, correspondingly, could lead to entitlement to agent fees.

Alternatively, appellant argues that even if § 20.201 is a valid interpretation of section 7105 such that specificity in the NOD is required as to the issues appealed, the Board erred in finding that the 100% schedular TBI rating was not encompassed in the June 2013 NOD challenging the denial of entitlement to TDIU. He asserts that a 100% schedular rating and TDIU are simply different means to the same result: a total disability rating. Thus, the veteran sought a total rating in the NOD and the basis on which that total rating was granted is irrelevant for purposes of entitlement to fees. Appellant contends that no factfinding is needed on this point, that the Court can reverse the Board's decision on this basis, and that the Court can direct that he is entitled to obtain a portion of the past due benefits VA awarded the veteran for TBI.

Additionally, at oral argument appellant argued that the TBI diagnostic code is unique in that it obligates VA to provide a separate disability rating for each physical manifestation as a residual of TBI. He contends that because of the unique nature of TBI, the June 2013 NOD, in directly appealing the denial of service connection for an acquired psychiatric disorder as a residual of TBI and seeking a total rating through TDIU, encompassed an appeal of all other TBI residuals.[27]

The Secretary argues that the June 2013 NOD appellant filed on the veteran's behalf did not result in any past-due benefits that would entitle appellant to a fee. He asserts that § 20.201 is a valid construction of section 7105 and unambiguously requires that a claimant specify the issue or issues he or she wishes to challenge when there are multiple issues adjudicated in a rating decision, as is the case here. The Secretary contends that here appellant never challenged the veteran's TBI disability rating. Furthermore, the Secretary argues that the Board did not clearly err by finding that a 100% rating for TBI was based on VA's own initiative and not in response to an NOD. And he contends that the Board had a plausible basis for determining that the appeal of TDIU did not include an appeal of the disability rating for TBI because the veteran had multiple service-connected conditions that formed the basis of entitlement to TDIU. Finally, the Secretary challenges the appellant's reliance on the pro-veteran canon because he is not a veteran and submits

---

[27] Oral Argument (O.A.) at 3:19-:46, 23:00-24:00, 1:03:22-:05:00, *Gumpenberger v. McDonough*, U.S. Vet. App. No. 20-4155 (oral argument held Jan. 19, 2022), http://www.uscourts.cavc.gov/oral_arguments_audio.php.

that appellant has not shown how the veteran is prejudiced by the Board's decision to deny agent fees.

## III. ANALYSIS

This matter involves the interplay between 38 U.S.C. § 5904, governing agent (and attorney) fees, and the provisions governing NODs more generally, specifically 38 U.S.C. § 7105 and 38 C.F.R. § 20.201. So, the appeal is essentially one about statutory and regulatory interpretation. Statutory interpretation is a pure question of law that we review de novo.[28] "In determining the meaning of a statutory provision, 'we look first to its language, giving the words used their ordinary meaning.'"[29] But we do not read statutory words or provisions in isolation. "[T]he plain meaning of any statutory provision must be determined in light of the statutory scheme as a whole, the specific context in which the word or provision at issue is used, and the broader context of the statute as a whole."[30] If the Court concludes that Congress's intent is clear, we end our inquiry and give effect to that intent.[31]

And our task is similar in interpreting a regulation, which is also a matter we review de novo.[32] We look first to the text and structure of a regulation, which is the best indication of its plain meaning.[33] If the plain meaning of the regulation is clear on its face, then such plain meaning controls, and "that is 'the end of the matter.'"[34]

We begin with a rare piece of common ground between the parties. They agree that the version of the statute explaining when an agent (or attorney) is entitled to a fee that applies in this case provides:

---

[28] *See Saunders v. Wilkie*, 886 F.3d 1356, 1360 (Fed. Cir. 2018).

[29] *Frederick v. Shinseki*, 684 F.3d 1263, 1269 (Fed. Cir. 2012); *see Artis v. District of Columbia*, __ U.S. __, __, 138 S. Ct. 594, 603 (2018) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).

[30] *Hornick v. Shinseki*, 24 Vet.App. 50, 52 (2010); *see King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (articulating same basic principles); *Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1564 (Fed. Cir. 1995) (same).

[31] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

[32] *See Foster v. McDonough*, 34 Vet.App. 338, 344-45 (2021); *see also Butts v. Brown*, 5 Vet.App. 532, 539 (1993) (en banc).

[33] *See Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017).

[34] *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)); *see also Kisor v. Wilkie*, __ U.S. __, __, 139 S. Ct. 2400, 2415 (2019).

[I]n connection with a proceeding before the Department with respect to benefits under laws administered by the Secretary, a fee may not be charged, allowed, or paid for services of agents and attorneys with respect to services provided before the date on which [an NOD] is filed with respect to the case.[35]

The key to understanding this statute is the language at the end of the provision that sets the triggering date for when fees may be charged. Phrasing the statutory rule in the affirmative, fees are permitted only beginning on "the date on which [an NOD] is filed with respect to the case." For context, recall that appellant argues that he is entitled to a fee based on VA's award of a 100% schedular disability rating for TBI because he filed the June 2013 NOD. He makes this argument even though that NOD referred only to service connection for an acquired psychiatric disorder and entitlement to TDIU. To explore this argument, we will begin by considering the requirements for an NOD and then consider the phrase in subsection 5904(c)(1) on which appellant puts great emphasis, namely "with respect to the case."

*A. Scope of an NOD Under 38 U.S.C. § 7105 and 38 C.F.R. § 20.201*

Because section 5904 refers to an NOD, we start with the language of the 2013 version of 38 U.S.C. 7105 that describes what is required to constitute an NOD. Section 7105(a) provides that "[a]ppellate review will be initiated by a [N]otice of [D]isagreement and completed by a [S]ubstantive [A]ppeal after a statement of the case is furnished."[36] Additionally, the statute requires that "Notices of [D]isagreement, and appeals, must be in writing and may be filed by the claimant, the claimant's legal guardian, or such accredited representative, attorney, or authorized agent as may be selected by the claimant or legal guardian."[37]

The statute's plain language makes clear that an NOD must be (1) in writing and (2) filed by the correct party, specifically the claimant or a suitable representative. The statute also tells us that filing an NOD triggers appellate review and leads to the preparation of an SOC and, potentially, a Substantive Appeal should a claimant wish to continue an appeal he or she began with an NOD. Appellant argues that because these requirements are broad, the June 2013 NOD was sufficient to appeal the schedular disability rating for TBI (thereby entitling him to a fee), even

---

[35] 38 U.S.C. § 5904(c)(1) (2012). In 2017, Congress amended this provision to allow a fee to be charged from the date notice of an initial decision by the agency of original jurisdiction is issued. AMA, Pub. L. No. 115-55 § 2(n), 131 Stat. 1105, 1110. However, as noted above, the current version is not applicable here.

[36] 38 U.S.C. § 7105(a) (2013).

[37] 38 U.S.C. § 7105(b)(2).

though the NOD stated that the veteran disagreed *only* with the denial of service connection for an acquired psychiatric condition and entitlement to TDIU. However, appellant's view of section subsection 7105(a) reads the provision in isolation, without the benefit of the rest of the statute.

> Importantly, subsection 7105(d)(1) provides the following:

> Where the claimant, or claimant's representative, within the time specified in this chapter, files a [N]otice of [D]isagreement with the decision of the agency of original jurisdiction, such agency will take such development or review action as it deems proper under the provisions of regulations not inconsistent with this title. [38]

So, the NOD triggers VA's obligation to develop a claim, something that can certainly be a time-consuming and resource-intensive process. It seems illogical that Congress would direct development of issues that a claimant did not intend to appeal, especially given the overburdened VA appeals system, or require VA to act to determine the scope of a claimant's disagreement. Additionally, and of particular importance here, this provision goes on to require that an SOC provide a "summary of the evidence in the case pertinent to the issue or issues *with which disagreement has been expressed*."[39] If an NOD did not have to specify the determinations with which a claimant disagreed, it would be odd for Congress to have included the portion of this statutory provision we have italicized.

Therefore, when section 7105 is considered as a whole, it is best read to require a claimant to identify in an NOD what issues he or she seeks to appeal, so that the rest of the legacy appeals process can continue with the preparation of an SOC that addresses only the appealed issues, develop those matters as appropriate, and allow for a Substantive Appeal perfecting the appeal with respect to issues that are the subject of the SOC. Stated differently, while subsection 7105(b) only requires that an NOD be in writing and filed by the appropriate person, when subsection 7105(b) is read along with subsection 7105(d), it is clear that before an SOC can be issued, disagreement must be expressed with the determinations that the claimant seeks to appeal.

Appellant essentially argues that the specific content of an NOD does not matter as long as a document indicating any disagreement with an adjudication is filed.[40] On this logic, VA must develop any pending claims in an unfavorable rating decision or otherwise explore whether a

---

[38] 38 U.S.C. § 7105(d)(1).

[39] 38 U.S.C. § 7105(d)(1)(A) (emphasis added).

[40] Appellant's Br. at 10-11.

claimant is actually contesting a given determination. This interpretation, however, adds a step into the legacy appeals process that is not contemplated by the statute. Section 7105 does not provide for a post-NOD notification from VA that requests that a claimant explain what issues he or she seeks to appeal with the NOD. Of course, Congress could have so provided, but it did not. Instead, the plain language of section 7105, read as a whole, reveals that Congress intended for the issues that a claimant appeals to be identified with the filing of the NOD.

Even if we assumed that section 7105 does not require such identification, we conclude that, at worst, subsection 7105(b)'s broad language prescribing what is required for an NOD leaves an opening for the Agency to fill about the specification question.[41] For a statute to be considered silent under step one of the familiar *Chevron* formulation by which we assess a regulation's validity,[42] there must be a "'gap left, implicitly or explicitly, by Congress'" that the agency is entitled to fill.[43] If this is the case, then we must determine whether VA's regulation governing NODs, 38 C.F.R. § 20.201, is a permissible construction of the statute to fill the gap left by Congress in section 7105.[44] According to the Supreme Court, in applying *Chevron*, "the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency stayed with the bounds of its statutory authority."[45]

Recently, the Federal Circuit applied the gap-filling aspect of *Chevron* specifically to VA in connection with a dispute about when disability payments to a veteran recommenced when a veteran returned to active military service (thereby stopping the payments) and then left that second period of active service to return to civilian life.[46] The court found that Congress left a gap in the

---

[41] *See Northport Health Servs. of Ark., L.L.C. v. U.S. Dep't of Health & Human Servs.*, 14 F.4th 856, 871-73 (8th Cir. 2021).

[42] *Chevron*, 467 U.S. at 842-45.

[43] *Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1354 (Fed. Cir. 2021) (quoting *Chevron*, 467 U.S. at 843).

[44] *See Sears v. Principi*, 349 F.3d 1326, 1329 (Fed. Cir. 2003).

[45] *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

[46] *Buffington v. McDonough*, 7 F.4th 1361 (Fed. Cir. 2021). This decision issued after the Federal Circuit's decision in *Kisor v. McDonough*, 995 F.3d 1347 (Fed. Cir. 2021), which addressed the appropriate place for the pro-veteran canon in the *Chevron* analysis. So, at least in *Buffington*, the Federal Circuit relied on a *Chevron* analysis in a gap-filling context before considering the pro-veteran canon. We need not consider how this "ordering of operations" might be different when considering an *ambiguous* statute, as opposed to one that merely contains a gap for the Agency to fill. *See Barry v. McDonough*, No. 20-3367, 2022 U.S. App. Vet. Claims LEXIS 154, at *38-45 (Feb. 2, 2022) (Jaquith, J., concurring in part and dissenting in part) (discussing the place of the pro-veteran canon in regulatory interpretation). Notwithstanding the suggestion in *Barry* that the pro-veteran canon should be applied at *Chevron* step one, *id.* at *39, we are bound to follow the Federal Circuit's lead in *Buffington* in this case.

statutory scheme, specifically in failing to provide "when or under what conditions compensation recommences once a disabled veteran leaves active service."[47] Because the statute was silent on that point, the Federal Circuit considered whether the implementing regulation, 38 C.F.R. § 3.654(b)(2), was a permissible construction of the statute under the *Chevron* formulation. The court held that the Secretary acted "within the scope of his authority 'to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department and are consistent with those laws.'"[48] The Federal Circuit further noted that "[t]hat authority gives the Secretary power to fill gaps in the veteran's benefits scheme."[49] Within the scope of that authority, the court held, § 3.654(b)(2) was a "reasonable gap-filling regulation" that incentivizes early filing and "promotes the efficient administration of benefits, but it does not promote efficiency at all costs."[50]

Returning to the issue before us in this appeal, we first turn to the language and structure of section 7105 to determine whether Congress left gaps for the Agency to fill. Given the broad nature of subsection 7105(b), it appears that Congress left VA leeway to determine how NODs would operate. Specifically, the statute does not expressly address what happens when a claimant seeks to appeal an unfavorable decision that addresses multiple issues.[51]

Following the Federal Circuit's reasoning in *Buffington*, because "the statute is silent . . . with respect to the specific issue," the Court must determine whether the Secretary's interpretation is reasonable.[52] We must sustain an agency's gap-filling regulation if it is reasonable and consistent with the statutory framework.[53]

Here, VA stepped in to fill the gaps (we assume) Congress left in section 7105 by promulgating 38 C.F.R. § 20.201, which defines "Notice of Disagreement" as follows:

> A written communication from a claimant or his or her representative expressing dissatisfaction or disagreement with an adjudicative determination by the agency of original jurisdiction and a desire to contest the result will constitute a Notice of

---

[47] *Buffington*, 7 F.4th at 1365.

[48] *Id.* at 1366 (quoting 38 U.S.C. § 501(a)).

[49] *Id.* (citing *Contreras v. United States*, 215 F.3d 1267, 1274 (Fed. Cir. 2000)).

[50] *Id.* at 1367.

[51] Though we reiterate, as discussed above, that there are important textual indications in section 7105 read as a whole that point toward requiring identification of the specific issues a claimant wishes to contest.

[52] *Chevron*, 467 U.S. at 843.

[53] *Sears*, 349 F.3d at 1329.

Disagreement. While special wording is not required, the Notice of Disagreement must be in terms which can be reasonably construed as disagreement with that determination and a desire for appellate review. *If the agency of original jurisdiction gave notice that adjudicative determinations were made on several issues at the same time, the specific determinations with which the claimant disagrees must be identified.* For example, if service connection was denied for two disabilities and the claimant wishes to appeal the denial of service connection with respect to only one of the disabilities, the Notice of Disagreement must make that clear.[54]

Just like section 7105, § 20.201 also requires that an NOD be in writing and that it express disagreement with a benefits determination. But the regulation goes a step further, answering a question that we are assuming Congress did not address explicitly: what happens when there are multiple issues adjudicated in an initial determination? In that case, the Secretary requires that a claimant identify which specific issues he or she seeks to appeal.

Like the regulation at issue in *Buffington*, § 20.201 "promotes the efficient administration of benefits." It would be a waste of VA's resources to develop claims that a claimant has expressed no interest in appealing. Additionally, the regulation places a relatively small burden on a claimant to simply note the issues with which he or she disagrees. Thus, we hold that § 20.201 is entirely consistent with section 7105 and constitutes a reasonable gap-filling construction of the statute.

We also note that this interpretation of the regulation is bolstered by the Federal Circuit's decision in *Ledford v. West*, which addressed our Court's jurisdiction to consider a challenge to a VA circular that changed TDIU to a 100% schedular rating.[55] In reaching its decision, the Federal Circuit noted that our Court "lacked jurisdiction to consider Ledford's . . . challenge to the termination of his individual unemployability benefits in 1981" because he "cannot point to an NOD that expresses disagreement with the termination of" TDIU.[56] The Federal Circuit noted that an NOD "is required to initiate the appellate review process"[57] and that the appellant's "1991 NOD, which expressed disagreement with the [A]gency's 1990 determination concerning the effective date for the increase in his schedular rating, is insufficient to confer jurisdiction . . . over the

---

[54] 38 C.F.R. § 20.201 (2013) (emphasis added). We again make clear that this matter requires us to analyze the version of § 20.201 that applied in 2013. This regulation has been amended on several occasions since that time, but, again, the more recent versions are not at issue, and we express no views about them.

[55] 136 F.3d 776 (Fed. Cir. 1998).

[56] *Id.* at 779.

[57] *Id.*

[A]gency's 1981 determination which terminated [TDIU]."[58] The Federal Circuit held that "an NOD must have indicated a disagreement with a *specific determination*."[59]

Though the Federal Circuit addressed NODs in the context of our Court's jurisdiction to hear an appeal, *Ledford* still tells us that specificity under § 20.201 is required in an NOD when an initial adjudication addresses multiple issues. Additionally, the Federal Circuit discussed section 7105 in its analysis and gave no indication that § 20.201 exceeded VA's regulatory authority under the governing statutes.

In sum, § 20.201 at worst serves a gap-filling function because Congress was silent in subsection 7105(b) as to when an initial determination addresses several issues that a claimant may seek to appeal. At best, section 7105, when read as a whole, plainly requires specificity in the NOD because it mandates that an SOC address evidence and development only as to the issues a claimant identifies as those on appeal. Therefore, we hold that the Secretary's regulation is a reasonable interpretation of section 7105, and we reject appellant's request that we invalidate it.

In applying section 7105 and § 20.201 to this case, it is clear that in the June 2013 NOD, appellant, on the veteran's behalf, expressly sought to appeal the Board's decision denying entitlement to TDIU and service connection for an acquired psychiatric disorder. The NOD does not mention TBI or any of its residuals. Because the May 2013 rating decision decided multiple issues, pursuant to § 20.201 the veteran was required to indicate which of those issues he sought to appeal. Here, he did so through the June 2013 NOD filed by appellant on his behalf. Thus, on its face, the June 2013 NOD did not appeal the TBI disability rating and, as a result, appellant is not entitled to agent fees as to that issue unless something in section 5904 changes that conclusion, a matter we turn to in a moment.[60]

But before returning to section 5904, we pause to address one additional point concerning appellant's contentions. To the extent that appellant argues that the May 2013 rating decision only adjudicated issues related to TBI and its residuals and thus any NOD filed in response to that

---

[58] *Id.* at 780.

[59] *Id.* (emphasis added).

[60] This is not a situation in which an NOD is vague or ambiguous. In that context, both the Federal Circuit and this Court have held that it is appropriate to explore a claimant's intent in terms of which determinations he or she wished to contest. *See, e.g.*, *Collaro v. West*, 136 F.3d 1304, 1308-09 (Fed. Cir. 1998); *Jarvis v. West*, 12 Vet.App. 559, 560 (1999); *Buckley v. West*, 12 Vet.App. 76, 82-83 (1998). As we have discussed, the June 2013 NOD is clear about the two matters appellant listed as those the veteran contested.

decision must, by necessity, include TBI,[61] we reject this argument. His description of the May 2013 rating decision ignores the fact that TDIU was also adjudicated in that rating decision, so even under appellant's argument, the decision concerned TBI *and* TDIU. As we will discuss in further detail below, TDIU is based on requirements different than those that apply to a schedular rating for TBI and its residuals. Furthermore, the May 2013 rating decision listed multiple determinations VA made once service connection for TBI was granted.[62] Those determinations indicate that, pursuant to VA's approach to evaluating TBI in terms of disability ratings, the veteran was awarded different disability ratings for distinct TBI residuals. Appellant clearly did not think at the time that an NOD automatically encompassed all issues, as he specifically listed those he sought to appeal: denial of TDIU and denial of service connection for an acquired psychiatric claim. Furthermore, it would be illogical to expect VA to develop appeals as to all the issues decided in the May 2013 rating decision when the veteran, represented by an experienced agent, listed only two specific matters in his NOD.

### B. Section 5094(c)(1) and "with respect to the case"

Appellant argues the phrase "with respect to the case" in subsection 5904(c)(1) somehow expands the claims for which he may obtain a fee based on the June 2013 NOD. Essentially, he contends that the filing of the June 2013 NOD was sufficient to satisfy the requirements of subsection 5904(c)(1) with respect to any issue decided in the May 2013 rating decision and that the NOD did not need to mention the TBI rating issue at all.

Although read in isolation the phrase "with respect to the case" is broad, we are not writing on a blank slate. Caselaw provides context as to how the term "case" should be considered. In *Cameron v. Shinseki*, this Court addressed whether an increased-rating claim was part of the overall case for attorney fees purposes where an attorney represented the veteran in an initial claim for entitlement benefits, which remained on appeal.[63] The Court held that "case" in subsection 5904(c)(1)

> refers to a claim submitted by a claimant and adjudicated by the Secretary, including the adjudication of all elements and theories in support of such claim, but it does not include an additional claim for benefits that is presented after the final

---

[61] O.A. at 3:40-:50, 12:42-:57, 34:20-35:40.

[62] R. at 746-58.

[63] 26 Vet.App. 109 (2012), *aff'd*, 561 F. App'x. 922 (Fed. Cir. 2014).

adjudication of the earlier claim, with new, different, or additional evidence even if the additional claim is related to the disability underlying the earlier claim.[64]

Thus, the Court held the subsequent increased rating claim was a "stand-alone claim, adjudicated separately and independently" from the initial claim for entitlement to benefits.[65] The Court noted that the definition of "[']case['] relates to all potential claims raised by the evidence during the processing of the claim in question."[66]

Our Court considered *Cameron* in the context of two earlier Federal Circuit cases. First, in *Carpenter v. Nicholson*, the Federal Circuit considered entitlement to attorney fees where an attorney represented a veteran in his quest for an increased rating and later filed a motion to revise an earlier decision on the basis of clear and unmistakable error in order to obtain an earlier effective date for the rating.[67] The Federal Circuit held that different issues arising throughout the proceedings did not constitute different "cases" requiring different fee agreements.[68] In discussing *Carpenter*, our Court noted the "continuous prosecution" of the same claim relied on by the Federal Circuit to reach its conclusion.[69]

Next, the *Cameron* Court considered *Jackson v. Shinseki*,[70] in which the Federal Circuit held that an attorney was not entitled to fees based on past-due benefits from an award of TDIU where the original case involved an increased rating and did not include evidence of unemployability. Our Court held that *Cameron*, like *Jackson*, involved "evidence that was not part of [the] original claim."[71]

*Cameron*, *Carpenter*, and *Jackson* were decided before Congress amended section 5904 to allow the payment of fees when an NOD is filed, the situation under the statute governing this appeal. At the time of those three decisions, section 5904 did not allow payment of fees until after a Board decision. Nonetheless, they provide context for how this Court and the Federal Circuit

---

[64] *Id.* at 110.

[65] *Id.* at 111.

[66] *Id.* at 115.

[67] 452 F.3d 1379 (Fed. Cir. 2006).

[68] *Id.* at 1384.

[69] 26 Vet.App. at 115.

[70] 587 F.3d 1106 (Fed. Cir. 2009).

[71] 26 Vet.App. at 116.

understand the definition of "case" in section 5904. Specifically, these matters highlight that a "case" requires that a later issue must have some connection to the original matter in which a represented the veteran through, for example continued proceedings.

In this matter, a schedular rating for TBI and TDIU are separate cases as defined in *Carpenter* because they are separate claims on different procedural tracks. Appellant specifically appealed one and not the other, breaking the continuous prosecution of the two claims. Indeed, the NOD appellant filed on the veteran's behalf in June 2013 defined the "case" for purposes of the appeal as entitlement to TDIU and the later-withdrawn claim seeking service connection for an acquired psychiatric disorder.[72] Furthermore, the award of a 100% schedular rating for TBI was not related to the processing of the claims listed in the June 2013 NOD, here TDIU and the later-withdrawn appeal concerning service connection for the psychiatric condition. Instead, the Board's determination that the 100% schedular rating for TBI was the result of VA's independent review of TBI cases and had nothing to do with the appeal of TDIU is not clearly wrong. Indeed, it appears to be entirely correct. Thus, like in *Cameron*, the award of a 100% schedular rating for TBI was not related to the development of the appeal for TDIU and does not establish entitlement to fees. Furthermore, as we discuss in more detail below, the requirements for a 100% schedular rating are different from those for entitlement to TDIU. Thus, these matters represent different cases as contemplated under section 5904.

Additionally, as an experienced veteran's representative, appellant made a tactical choice to appeal TDIU and an acquired psychiatric disorder claim but not the 70% rating assigned for TBI or any of the ratings assigned for TBI residuals. He made that choice on multiple occasions. First, he filed the June 2013 NOD expressly listing *only* TDIU and the acquired psychiatric disorder claim as the issues the veteran sought to appeal.[73] Then, appellant did not object to the issues as identified in the August 2014 SOC, which also listed *only* TDIU and the acquired

---

[72] Appellant's definition of the "case" in his NOD, along with his subsequent refinement of that definition by withdrawing his psychiatric claim, takes his case outside the ambit of *Carpenter*'s declaration that "[t]he case encompasses 'all potential claims raised by the evidence, applying all relevant laws and regulations, regardless of whether the claim is specifically labeled.'" *Carpenter*, 452 F.3d at 1384 (quoting *Roberson v. Principi*, 251 F.3d 1378, 1384 (Fed. Cir. 2001)); *see also Mil.-Veterans Advoc. v. Sec'y of Veterans Affs.*, 7 F.4th 1110, 1141 (Fed. Cir. 2021) (holding that, under the AMA, a "supplemental claim seeking the 'same or similar benefits on the same or similar basis' as the original claim "is part of the same case as a veteran's original claim for benefits within the meaning of 5904(c) (quoting 38 U.S.C. § 101(36)).

[73] R. at 732.

psychiatric claim as the issues on appeal.[74] Again, in the October 2014 substantive appeal, he checked a box indicating he sought to appeal the issues listed in the statement of the case and then explicitly identified *only* a psychiatric condition and TDIU as the issues being challenged.[75] Finally, appellant submitted the December 2015 letter withdrawing an appeal as to the denial of service connection for the acquired psychiatric disorder and noting that the veteran continued to seek TDIU.[76] At no point in any of this correspondence with VA did appellant indicate that the veteran sought to appeal the TBI rating assigned in the May 2013 rating decision. Instead, he appears to have made a strategic choice as to what issues to pursue on appeal. Appellant's arguments now would have us revise that tactical choice to allow for him to obtain agent fees with respect to matters that were consciously never the subject of an NOD. However, under section 5904, we hold that entitlement to TDIU and the 100% TBI schedular rating constitute different cases and thus appellant is not entitled to agent fees on this basis.

Appellant would have the Court divorce the NOD requirement in section 5904 from the "case" language by focusing on the act of filing the NOD as triggering entitlement to fees but without considering whether it is related to the "case." Under the plain language of subsection 5904(c)(1), what constitutes a "case" is tied to the filing of an NOD, a fact that appellant seems to diminish. To the extent that appellant acknowledges section 5904's NOD and "case" connection, he appears to advocate for a definition of NOD that is in some way different from how that term is understood more generally as we discussed above.[77] But statutory provisions must be read in context.[78] And because section 5904 falls within title 38, it is logical to assume that Congress intended the terminology used in that section be consistent with the rest of the title. Indeed, it is a principle of statutory construction that "'identical words used in different parts of the same act are intended to have the same meaning.'"[79] Specifically, the use of "NOD" in section 5904 should have the same definition as in other provisions, including 38 U.S.C. § 7105, which provides the requirements for an NOD that we discussed above. Appellant provides no explanation for why

---

[74] R. at 682.

[75] R. at 435.

[76] R. at 429.

[77] O.A. at 5:09-6:18 (discussing reading "valid" into section 5904 by considering the content of the NOD).

[78] *See Hornick*, 24 Vet.App. at 52.

[79] *Sullivan v. Stroop*, 495 U.S. 478, 484 (1990) (quoting *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986)).

Congress would have intended a different meaning for "NOD" in section 5904, and thus we proceed with the understanding that section 5904's use of "NOD" must be consistent with how it is used in other provisions.

Finally, we cannot help but note that appellant fails to establish what, if any, services he provided as it relates to the award of veteran's TBI schedular rating.[80] At oral argument, his attorney could not point to anything that appellant did to assist the veteran in obtaining the 100% schedular rating for TBI.[81] In fact, in his brief, appellant tied VA's action in reviewing TBI cases to the June 2013 NOD he filed.[82] But VA's independent review of cases in which a veteran received a TBI examination and appellant's filing of an NOD on the veteran's behalf were, as the Board found, completely unrelated. They just so happen to have occurred sequentially. In other words, it was purely coincidental that VA sought to review TBI cases, including the veteran's, while the appeal of TDIU and acquired psychiatric disorder claim, started by the 2013 NOD, was pending. Thus, we cannot see how appellant should be entitled to fees under section 5904.

### C. Difference Between TDIU and a 100% Rating for TBI

As an alternative argument, appellant maintains that even if the June 2013 NOD did not specifically appeal the disability rating for TBI, and § 20.201 is valid, his appeal of entitlement to TDIU included an appeal of an increased schedular rating for TBI because both claims could lead to the same result: a 100% rating for the veteran. If this point was correct, appellant would be entitled to fees because the NOD identifying TDIU would encompass the TBI rating. We reject this argument as well as the others appellant has advanced to obtain a portion of past-due benefits VA awarded to the veteran for his TBI.

We start with the obvious but nonetheless significant observation that obtaining a 100% disability rating under the rating schedule requires establishing elements that are distinct from establishing entitlement to TDIU. To be sure, our Court has held that an appeal of a disability rating can include an appeal of entitlement to TDIU, but the reverse is not necessarily true. Significantly, in *Holland v. Brown*, this Court held that

> [a]lthough a TDIU rating claim predicated on a particular service-connected condition is 'inextricably intertwined' with a rating increase claim regarding the

---

[80] *See Scates v. Nicholson*, 282 F.3d 1362, 1366 (Fed. Cir. 2002) (holding that an attorney "may receive a fee that fairly and accurately reflects his contribution to and responsibility for the benefits awarded").

[81] O.A. at 7:22-9:03, 56:14-57:26.

[82] Appellant's Br. at 12.

same condition, it does not necessarily follow that a rating increase claim for a particular service-connected condition is 'inextricably intertwined' with a TDIU rating claim predicated on that condition.[83]

The Court continued that "while complementing each other, the Schedule [for Rating Disabilities] and the TDIU rating scheme involve different considerations."[84]

In *Norris v. West*, the Court held that "under the VA statutory and regulatory scheme evidence of a veteran's unemployability arising from an already allowed service-connected disability is indeed evidence of an increase in the severity of that disability."[85] The Court considered an informal claim for a psychiatric condition and held that it included a request for TDIU where there was evidence of unemployability. The Court held that TDIU "is merely an alternate way to obtain a total disability rating without being rated 100% disabled under the Rating Schedule."[86]

More recently, our Court held that entitlement to TDIU is "part and parcel" of a disability rating.[87] "[A] request for TDIU . . . is not a separate claim for benefits, but rather involves an attempt to obtain an appropriate rating for a disability or disabilities."[88] In *Rice*, the Court held that TDIU was part of the determination of the appropriate initial disability rating assigned and thus perhaps entitled to an earlier effective date based on that initial rating. Similarly, in *Harper v. Wilkie*, we held that TDIU was part of an underlying PTSD rating claim that was in appellate status.[89]

Here we differ from *Harper* because no disability rating underlying entitlement to TDIU was placed in appellate status by the June 2013 NOD. Rather, this case presents the opposite fact pattern: TDIU was placed in appellate status but not any of the veteran's underlying service-connected disabilities. As noted above, the veteran had several underlying service-connected disabilities as a result of the May 2013 rating decision, and he did not appeal any of the ratings assigned for those disabilities.

---

[83] 6 Vet.App. 443, 446 (1994).

[84] *Id.*

[85] 12 Vet.App. 413, 420 (1999).

[86] *Id.* at 420-21.

[87] *Rice v. Shinseki*, 22 Vet.App. 447, 455 (2009) (per curiam).

[88] *Id.* at 453.

[89] 30 Vet.App. 356, 360 (2018).

And, following the logic of *Holland* for determining when issues are inextricably intertwined, it is unclear to us why an NOD as to TDIU would encompass an appeal of any particular disability rating because, while the two claims may complement each other, they involve different considerations. In *Rice*, the Court held that the issue of the appropriateness of TDIU is inferred as part of a claim whenever evidence of unemployability is submitted with a claim for increased disability benefits.[90] In order for the reverse to be true–the inference of a claim for an increased rating for a specific disability when TDIU is appealed–VA would often have to make "guesses" about any number of matters. For example, what disability rating a claimant seeks to appeal when there are multiple service-connected disabilities (as is the case here). Again, we venture into a world where VA is required to do significantly more development of issues with respect to claims that a claimant has expressed no interest in appealing. Indeed, appellant's argument would require VA to consider (and develop evidence concerning) increased schedular disability ratings for any condition for which VA had awarded service connection to a veteran so long as a veteran appealed the denial of entitlement to TDIU. Appellant provides no support–legally or logically–for that rather remarkable proposition. In short, because entitlement to TDIU and a higher schedular rating involve different considerations, we hold that appellant's NOD that expressly appealed TDIU did not encompass an appeal of the disability rating assigned for TBI.

At oral argument, appellant's counsel asserted that TBI is a unique type of claim because it encompasses so many symptoms and other disorders that lead to various other ratings.[91] Thus, he argued that a disagreement as to any aspect of a residual of TBI includes a disagreement as to all.[92] Despite appellant's counsel's contentions at oral argument,[93] he did not make this argument in his briefs. Instead, his briefing position was much more generalized with respect to all disability ratings and NODs. He did not focus on a special rule that would allow fees for a representative in a TBI rating case or ask that we make a pronouncement about how TBI ratings operate. We decline to consider this argument further.

"[T]his Court and the U.S. Court of Appeals for the Federal Circuit have repeatedly discouraged parties from raising arguments that were not presented in an initial brief to the

---

[90] 22 Vet.App. at 453-54.

[91] O.A. at 3:19-:46, 23:00-24:00, 1:03:22-:05:00.

[92] O.A. at 1:03:22-:05:00.

[93] O.A. at 1:06:48-:07:00.

Court."[94] The practice of presenting new issues and arguments during oral argument is even more objectionable.[95] Here, both the Secretary and the Court prepared for this matter based on the broad arguments involving complex statutory and regulatory interpretation. It is both unfair to opposing counsel and a waste of judicial resources for appellant's counsel to narrow the issue at such a late stage of litigation. We encourage him and other counsel to avoid such an approach in the future.

## IV. CONCLUSION

After consideration of the parties' briefs, the record on appeal, the proper arguments addressed at oral argument, and the governing law, the Court AFFIRMS the July 17, 2019, Board decision.

---

[94] *Norvell v. Peake*, 22 Vet.App. 194, 201 (2008); *see also Carbino v. West*, 168 F.3d 32, 34 (Fed. Cir. 1999) ("Improper or late presentation of an issue or argument . . . ordinarily should not be considered."), *aff'd sub nom. Carbino v. Gober*, 10 Vet.App. 507, 511 (1997); *Fugere v. Derwinski*, 1 Vet.App. 103, 105 (1990) ("Advancing different arguments at successive stages of the appellate process does not serve the interests of the parties or the Court. Such a practice hinders the decision-making process and raises the undesirable specter of piecemeal litigation.").

[95] *Norvell*, 22 Vet.App. at 202.